CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAY 31 2018

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| TAMARA EPPERSON, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 4:16-cv-00050 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| DAN SMITH, et al., | ) | By: Hon. Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendants. | ) | |

This matter is before the Court on several pending motions: a Motion for Summary Judgment from Defendants Brian Hubbard, Danny Martin, and Terry Mikels; a Motion for Summary Judgment from Defendants Rob Coleman and Dan Smith; a Motion to Dismiss Plaintiffs' Amended Complaint from Defendant Stephanie Brinegar-Vipperman; and a Motion for Summary Judgment filed by Plaintiffs James, Tamara, Kyle, and Mason Epperson. Following thorough briefing by the parties, I heard oral arguments on all of these motions on March 6, 2018. For the reasons stated herein, some of Plaintiffs' claims must proceed to trial.

I.     **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**[1]

This case is unique because the parties largely agree on all the relevant facts. Plaintiffs James and Tamara Epperson and their children, Plaintiffs Kyle and Mason Epperson, resided at 4037 Ararat Highway in Patrick County, Virginia ("the property") for over 20 years. Regrettably, due to the economic downturn, James's failing health, and bad circumstances, at some point in 2015 they became unable to pay the credit line on their home. As a result, their

---

[1] Although the facts are recounted herein according to the evidence before the Court, only Plaintiffs' allegations in their Amended Complaint are considered when ruling on Defendant Vipperman's Motion to Dismiss. For that motion, it is appropriate to accept all of Plaintiffs' factual allegations as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

lender initiated foreclosure proceedings against them. Plaintiffs do not fault anyone for this turn of events, nor do they dispute the validity and propriety of the foreclosure.

Nevertheless, on October 19, 2015, Plaintiffs' home was sold to Calvin and Vickie Payne ("the Paynes").[2] After the sale, the Paynes signed a contract with the trustee to purchase the property. Importantly, the contract of sale stated: "Vendor [the substitute trustee] will vacate the property on or before NOVEMBER 19, 2015," and "Possession of property to be given to Vendee on or before NOVEMBER 19, 2015." [ECF No. 113-7.] Plaintiffs do not dispute the validity of the sale.

Following the sale, Vickie Payne called James Epperson. Vickie left a voicemail informing Plaintiffs that she had purchased the home at the foreclosure sale and "she had to get the keys to it." (James Epperson Dep. 10:15–19.) When James Epperson returned her call, he told her that if she gave his family thirty days to move, he would not force her to get a court order to have the family removed from the property. (Id. 10:20–23.) Although Vickie Payne did not expressly consent to James Epperson's proposal, she did agree to come by the property on the afternoon of October 20 to pick up the keys. The two agreed to speak again around lunchtime on October 20 to confirm a time for Vickie Payne to come by. (Id. 11:–12:6.)

Despite her agreement with James Epperson and the language in the contract of sale, Vickie Payne called Defendant Sheriff Dan Smith on October 19, **after** speaking with James Epperson. She told him that she had bought the property on the courthouse steps, had made a down payment, and that she was worried someone might steal or damage a generator on the property. (Dan Smith Dep. 14:17–15:22.) She asked him whether she could get into the house. Smith did not know the answer, so he told Vickie Payne he would consult with the Commonwealth's Attorney, Defendant Stephanie Brinegar-Vipperman ("Vipperman"). Smith

---

[2] Plaintiffs voluntarily dismissed their claims against the Paynes. [ECF No. 64.]

did no independent investigation to confirm anything Vickie Payne told him. According to Smith, he assumed the home was abandoned. (Id. 17:3–5.)

When he called Vipperman, he relayed to Vipperman what Vickie Payne had told him, and Vipperman advised him that the house belonged to the Paynes and the Paynes could go in. (Id. 24:6–10.) Vipperman recalls assuming that the "bank had done the writ" of possession on the property. (Stephanie Brinegar-Vipperman Dep. 9:17–19.) She understood Sheriff Smith to be asking whether deputies could go to the home with the Paynes "just to be peacemaker . . . ." (Id. 9:22.) To the best of her recollection, Smith asked whether the deputies could go to the property with the Paynes "and just make sure everything is peaceful and safe." (Id. 18:7.)

Smith called Vickie Payne back and informed her that Vipperman had advised that the house was hers and she could go in. (Smith Dep. 24:6–16.) At that point, Vickie Payne asked if a deputy could go with her to access the property. (Id. 24:24–25:10.) Smith said he would arrange for a deputy to go with her to the property that evening; Vickie Payne said she wanted to wait "*until the next day to do it*, daylight hours, so forth." (Id. 26:11–12 (emphasis added.)

Sheriff Smith called Deputy Dustin Foley and directed him to assist Vickie Payne. (Dustin Foley Dep. 11:15–12:21). According to Foley, Smith told him "the commonwealth attorney said for [him] to go up there and pretty much gain access to the house." (Id. 12:17–20.) Foley understood that he was to accompany Vickie Payne to the property, go in, and "clear the house, see if anyone was there." (Id. 14:7–8.)

That night, despite Vickie Payne's expressed reservations to Smith, the Paynes went with Foley to the property around 10:30. Although they knocked on the doors and windows, no one answered. After walking around the property, they decided to return again the next day.

Although James Epperson heard people attempting to gain entry into the home, he did not interact with any of them.

Around 6:00 a.m. on the morning of October 20, Foley called Defendant Lieutenant Rob Coleman. (Rob Coleman Dep. 11:21–23.) Coleman testified that Foley told him he had been to the property before "and attempted to make contact with somebody there inside the residence." (Id. 12:5–7.) After speaking with Foley, Coleman drove to the Sheriff's Office and spoke with Sheriff Smith by phone. Sheriff Smith "told [Coleman] that he had spoken with [the] Commonwealth Attorney, Stephanie Vipperman, and the Paynes had every right to be there on the property and that we could go with them to make sure that there was nobody else on the property." (Id. 15:9–13.) At no point did Coleman inquire as to whether any legal process had been undertaken to remove the Eppersons from the property, and Coleman and Smith did not discuss the extent of assistance that Coleman was permitted to provide to the Paynes. (Id. 17:16–19.) According to transcripts of the radio conversations that morning, Coleman knew the former owners were still living at the property. [See, e.g., ECF No. 121-13.] Coleman also knew that a legal process existed to evict a resident from a home. (See Coleman Dep. 10:6–11.) In going to the home, Coleman's intention was to make entry into the home and ensure no one was inside. (Id. 17:20–18:9.)

At around 8:30 that morning, Coleman and Deputy Lewis Carroll met the Paynes at the property. They banged on the front and back doors, but got no response from anyone inside. (Id. 23:1–18.) Coleman attempted to breach a walk-through door in the garage, but was unable to make entry. (Id. 25:16–26:3.) Coleman and Carroll had to leave the property because they were due in court at 9:30, so Coleman called Defendant Investigator Brian Hubbard and instructed him to bring breaching tools to the property. (Id. 25:1–17.)

After he left the property, Coleman met with Hubbard and Defendant Investigator Terry Mikels at the Ararat Volunteer Fire Department. According to Coleman:

> I explained to them in person what we had. I told them that I had knocked on the doors and the windows and I was not able to get anybody to respond inside. I told them that they [the Paynes] were trying to reach a locksmith, but one wasn't there when I left. You know, they [presumably the Paynes] did want to make entry. I had already spoken with the Sheriff and the Sheriff had consulted with the Commonwealth Attorney, and based on what they told me, you know, we had permission to go in. I had sent them to make entry into the residence just to make sure that there was nobody else inside and then Carroll and myself left.

(Id. 27:23–28:10.) Coleman also spoke with Defendant Investigator Danny Martin on the radio. (Id. 28:11–16.) Over the radio, Coleman told Martin that the Sheriff had spoken with the Commonwealth Attorney "and they[3] have every right to go in." [ECF No. 121-13.]

Hubbard was aware that a "writ of possession or unlawful detainer" action was typically necessary to remove someone from a house in an eviction proceeding. (Brian Hubbard Dep. 8:11–14.) Hubbard recalls that, at the fire station, he asked Coleman directly whether "papers" had been issued:

> I do recall asking Lieutenant Coleman if we had papers on the house and he said that it was taken care of. He had talked to the Sheriff, they had talked to the Commonwealth Attorney, and we were good to go in. . . . According to Lieutenant Coleman, we were supposed to go in.

(Id. 9:3–7; 18–21.) Based on that conversation, Hubbard believed they had authority to enter the home. (Id. 9:15–17.)

Hubbard and Mikels left the fire department. While en route to the property, Hubbard radioed Martin and asked him to meet them at the property as well. When Hubbard and Mikels arrived at the property, the Paynes were already there. While awaiting Martin, Hubbard and

---

[3] From the context of the statement, it appears "they" refers to the Paynes, not the deputies.

Mikels walked around the house, knocking on the doors. (Id. 17:19–21.) Hubbard and Vickie Payne even tried calling Plaintiffs' phone,[4] but no one answered. (Id. 17:22–18:21.)

A locksmith eventually arrived and was able to gain access to the garage. (Id. 22:4–9.) Hubbard, Martin, and Mikels ("the deputies"[5]) entered the garage with their weapons drawn. Inside the garage, and up several steps, was a glass door that led into the home. While the deputies were checking the vehicles in the garage to see if anyone was hidden inside, Hubbard noticed the barrel of a shotgun through the glass door. Hubbard yelled, "Sheriff's Office. Drop the gun." It was later determined that the man holding the shotgun was James Epperson. According to Hubbard:

> While we were yelling at him, it was almost like talking to a wall. It was like someone didn't understand. He had a glare or a glaze over his face. We call it the thousand yard stare. They are just, you know, looking right through me when I'm talking to them.

(Id. 29:12–17.) At that point, Hubbard was in fear for his life. (Id. 30:1–4.) He pointed his weapon, which had a flashlight attached to it, at James Epperson. The flashlight was bright enough to interfere with someone's ability to see. (Id. 30:18–23.)

Eventually James Epperson comprehended what the deputies were saying and lowered his gun. At the deputies' direction, James unlocked the door into the garage and let the deputies into the home. (Id. 32:11–13.) From that point on, James Epperson was completely cooperative. Once he was removed from the house, James was placed in handcuffs. (Id. 32:24–33:3.)

After he was placed in handcuffs, James Epperson was searched. One of the deputies— but not Martin—took James Epperson's keys from his pocket, "tosse[d] them to Vickie Payne

---

[4] The record is unclear as to whether the phone number attempted was a landline inside the property or a cellular phone belonging to one of the plaintiffs.

[5] The Court is aware of their differing ranks and uses the collective term "deputies" only for ease of reference.

and [said], 'I guess these are yours.'" (James Epperson Dep. 38:19–39:9.) James Epperson's key ring included car keys and keys to other personal property.

Hubbard then asked James whether anyone else was inside the house; James responded that his son, Kyle, was upstairs in bed because he was home, sick, from school. (Hubbard Dep. 35:5–16.) The deputies put on bullet proof vests and reentered the home to locate Kyle Epperson. (Id. 35:20–22.)

The deputies went through the home calling out for Kyle, and Kyle responded from upstairs. At some point (either in the home or later outside), Hubbard relayed to Kyle that the deputies had encountered his father with a shotgun and they simply wanted to get Kyle out of the house safely. (Id. 38:3–6.) Kyle complied with the deputies' instructions and came downstairs with his hands visible. The deputies asked him to lie on the ground; he complied. Mikels put him in handcuffs, and Kyle was escorted outside.

After they cleared the house, Kyle wanted to retrieve some personal items from the home. Hubbard—and possibly others—told Kyle that he needed the Paynes' permission to retrieve anything from the house. (Hubbard Dep. 41:18–21; 42:11–43:6.) The deputies assisted Kyle in carrying "a large computer and some stuff out to his car . . . ." (Id. 41:12–13; see also Kyle Epperson Dep. 13:7–24, 14:9–20.)

James Epperson was then transported to the Sheriff's office. The deputies spoke about charges, "about either getting several warrants on one of [them] getting the warrants all in one complaint." (Hubbard Dep. 45:7–11.) Ultimately, Hubbard got three warrants on one complaint; three counts of brandishing a firearm, one for each of the deputies. (Id. 45:12–17.)

James Epperson appeared in court on January 12, 2016, when the Commonwealth Attorney *nolle prossed* all charges against him. On her copy of the arrest warrant, she wrote:

> Bank hadn't completed foreclosure so Δ [James Epperson] had legal right to be there [and] police <u>didn't</u>

[ECF No. 121-24 (emphasis in original).]

Following this ordeal, James Epperson and his family brought suit in this Court on October 19, 2016, exactly one year after the foreclosure sale. (<u>See</u> Compl. [ECF No. 1].) Following preliminary rulings and the filing of an Amended Complaint [ECF No. 89], several motions were filed: Hubbard, Martin, and Mikels filed a Motion for Summary Judgment [ECF No. 100]; Smith and Coleman filed a Motion for Summary Judgment [ECF No. 110]; Vipperman filed a Motion to Dismiss [ECF No. 118]; and Plaintiffs filed a Motion for Summary Judgment [ECF No. 130]. Following *thorough* briefing on the motions, I heard oral arguments on March 6, 2018. After reviewing of the evidence (where appropriate), relevant law, and arguments of counsel, the matter is ripe for disposition.

## II.    <u>STANDARD OF REVIEW</u>

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678. In determining facial plausibility, the court must accept all factual allegations in the complaint as true. <u>Id.</u> The Complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and sufficient "[f]actual allegations . . . to raise a right to relief above the speculative level . . . ." <u>Twombly</u>, 550 U.S. at 555 (internal quotation marks omitted). Therefore, the Complaint must "allege facts sufficient to state all the elements of [the] claim." <u>Bass v. E.I. Dupont de Nemours & Co.</u>, 324 F.3d 761, 765

(4th Cir. 2003).  Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); George & Co. LLC v. Imagination Entertainment Ltd., 575 F.3d 383, 392 (4th Cir. 2009).  A genuine dispute of material fact exists "[w]here the record taken as a whole could…lead a rational trier of fact to find for the nonmoving party."  Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks and citing reference omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute cannot be created where there is only a scintilla of evidence favoring the nonmovant; rather, the Court must look to the quantum of proof applicable to the claim to determine whether a genuine dispute exists.  Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson, 477 U.S. at 249−50, 254.  A fact is material where it might affect the outcome of the case in light of the controlling law.  Anderson, 477 U.S. at 248.  On a motion for summary judgment, the facts are taken in the light most favorable to the non-moving party insofar as there is a genuine dispute about those facts.  Scott, 550 U.S. at 380.  At this stage, however, the Court's role is not to weigh the evidence, but simply to determine whether a genuine dispute exists making it appropriate for the case to proceed to trial.  Anderson, 477 U.S. at 249.  It has been noted that "summary judgment is particularly appropriate . . . [w]here the unresolved issues are primarily legal rather than factual" in nature.  Koehn v. Indian Hills Cmty. Coll., 371 F.3d 394, 396 (8th Cir. 2004).

## III.   <u>DISCUSSION</u>

### a.  <u>Stephanie Brinegar-Vipperman's Motion to Dismiss</u>[6]

In considering Vipperman's Motion to Dismiss, I am confined to a review only of the allegations in Plaintiffs' Amended Complaint. <u>See, e.g.</u>, <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). Upon review of those allegations, Plaintiffs have failed to state a claim against Vipperman and the counts against her will be dismissed.

Plaintiffs allege that Vipperman committed a due process and taking violation (Count I) and a Fourth Amendment violation (Count II). They also assert claims against her in her official capacity for violations of the Fourth (Count VIII) and Fourteenth (Count IX) Amendments.

Turning to the allegations in the Amended Complaint, the gravamen of Plaintiffs' allegations against Vipperman are that she "told Sheriff Smith that the Paynes 'could go to that property,' 'that basically it was her property now, . . . the home was Vickie's,' and that law enforcement 'could do there with the Paynes while they did what they wanted to do with their property.'" (Am. Compl. ¶ 29.) Plaintiffs do not allege that Vipperman authorized any of the alleged constitutional violations. They do not contend that Vipperman authorized: entering the home; searching the property; searching James Epperson; arresting James Epperson; searching Kyle Epperson; detaining Kyle Epperson; dispossessing James Epperson of his keys; or converting the personal property of the Eppersons to the Paynes. All that is alleged is that Vipperman advised Sheriff Smith that the property was "basically" the Paynes, and that law

---

[6] I pause to note that Plaintiffs' inclusion of over 100 pages of evidence in opposition to the motion to dismiss is improper. Under 12(b)(6), review is confined to the pleadings *only*. <u>See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.</u>, 367 F.3d 212, 234 (4th Cir. 2004). Accordingly, I have reviewed the motion without reference to or consideration of any extrinsic evidence.

enforcement could be present while the Paynes "did what they wanted to do with their property." (Am. Compl. ¶ 29.)

All things being equal, and however misguided Vipperman may have been in answering a complicated property question from the hip considering how these events played out, the advice she is alleged to have given was correct. After the foreclosure sale, the property *was* "basically" the Paynes. Although the answer to the question is murky, there is no doubt that the Paynes' interest in the home was greater than the Eppersons at the conclusion of the foreclosure sale.

At that point, the Paynes were entitled, under Virginia law, to make entry to the property "by such reasonable force as was necessary, short of that which threatened death or serious bodily harm, to regain possession." Shorter v. Shelton, 33 S.E.2d 643, 646 (Va. 1945) (citing Allen v. Gibson, 4 Rand. (25 Va.) 468, 471 (1826)). They certainly were within their rights to go to the property and ask the Eppersons to vacate. And law enforcement were certainly permitted to go with the Paynes while they did that. Taking the allegations in the light most favorable to Plaintiffs, the most that can be said is that Vipperman opined that law enforcement were permitted to go to the property with the Paynes and play the role of peacekeepers. No one can reasonably dispute that is an accurate statement.

Plaintiffs' argument, then, is that Vipperman's opinion, even if accurate, set in motion the events that took place. But that far-fetched attenuation is insufficient to state a claim here. There is no basis in the Amended Complaint to conclude that Vipperman should have known that her advice would not be heeded, nor any factual allegation that Vipperman did not intend for her advice to be heeded. Any constitutional violation that occurred cannot be linked to her advice, but rather to the failure to heed her advice. Counts I and II cannot stand, and Vipperman's Motion to Dismiss will be granted.

Turning to Counts VIII and IX, the claims against Vipperman in her official capacity, those claims are barred by the Eleventh Amendment. See Blankenship v. Warren Co., 918 F. Supp. 970, 974 n.4 (W.D. Va. 1996). In Virginia, a Commonwealth Attorney is a constitutional officer. Va. Const. art. VII, § 4; Burnett v. Brown, 72 S.E.2d 394, 395 (Va. 1952). The immunity afforded by the Eleventh Amendment extends, where appropriate, to "arms of the state" and state employees acting in their official capacities. See Harter v. Vernon, 101 F.3d 334, 337 (4th Cir. 1996). For the reasons I stated previously [see ECF No. 41, pg. 5–7], Vipperman is immune from suit in her official capacity. Counts VIII and IX must be dismissed as to Vipperman.

Because the Amended Complaint fails to state a claim against Vipperman upon which relief can be granted, her Motion to Dismiss is well taken.

**b. Hubbard, Martin, and Mikels's Motion for Summary Judgment**

Both Plaintiffs and Defendants Hubbard, Martin, and Mikels have moved for summary judgment on all counts. I will discuss each count, the relevant law, and the competing motions for summary judgment. First, however, considering that Hubbard, Martin, and Mikels have asserted a claim of qualified immunity as a defense to all counts, I will review the basics of qualified immunity before addressing each count.

Qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Initially, the Supreme Court required lower courts, when confronting a claim of qualified immunity, to proceed in sequential fashion by first determining "whether the plaintiff had shown a violation of a constitutional right, *and* only if so, determine

whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." Brown v. Elliott, et al., 876 F.3d 637, 641 (4th Cir. 2017) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  The Court mercifully changed course in 2009, holding that a District Court may "skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case."  Pearson, 555 U.S. at 232, 236 (quoting Saucier, 533 U.S. at 201) (internal quotation marks omitted).

To resolve the question whether the right was clearly established at the time of the defendant's conduct, the court must ascertain the "circumstances of the case."  Id. at 232 (quoting Saucier, 533 U.S. at 201).  "At summary judgment, in the qualified immunity context as in others, courts must view the evidence in the light most favorable to the party opposing summary judgment."  Brown, 876 F.3d at 641 (citing Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014)).  In so viewing the evidence, a court must "credit[] the plaintiff's evidence and draw[] all reasonable inferences in the plaintiff's favor."  Id. at 641–42.

"A court must then ask whether the official's conduct under these 'circumstances' violated 'clearly established law.'"  Id. at 642 (citing Plumhoff v. Rickard, 134 S. Ct. 2102, 2023 (2014)).  "Clearly established law" is not defined "at a high level of generality," because the "dispositive question is 'whether the violative nature of *particular* conduct is clearly established."  Luna, 136 S. Ct. at 308 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). A constitutional right is "clearly established" when "its contours [are] sufficiently clear that a reasonable officer would understand that what he is doing violates that right."  Hope v. Pelzer, 536 U.S. 730, 739 (2002).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Saucier v. Katz, 533 U.S. at 202 (citing Wilson v.

Layne, 526 U.S. 603, 615 (1999)). If the right is not "clearly established," the officer is entitled to immunity. See Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012).

1. Count I: Due Process/Takings Violation

Count I makes two complimentary claims: that Defendants Hubbard, Martin, and Mikels ("the deputies") effected a taking of their home without due process, and that the deputies effected a taking of their personal property without due process.

In order to succeed on a Due Process/Takings claim under the Fourth and Fourteenth Amendments, Plaintiffs "must show that [they] had a property interest, that the state deprived [them] of that interest, and that the procedures employed were constitutionally inadequate." Coleman v. Calvert Cnty., No. GJH-15-920, 2016 WL 5335477, at *7 (D. Md. Sept. 22, 2016) (citing Iota Xi Chapter of Sigma Chi Fraternity v. Patterson, 566 F.3d 138, 145 (4th Cir. 2009). In assessing a procedural due process claim, "[u]nless there has been a 'deprivation' [of a protected liberty or property interest] by 'state action,' the question of what process is required . . . is irrelevant, for the constitutional right to 'due process' is simply not implicated." Iota Xi Chapter of Sigma Chi Fraternity, 566 F.3d at 146 (quoting Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172 (4th Cir. 1988)). "In order for the plaintiffs to succeed on their procedural due process claim, they are obliged to show (1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action'; and (3) that the procedures employed were constitutionally inadequate." Id. (quoting Stone, 855 F.2d at 172).

Turning to the facts established in discovery, Defendant Hubbard, Martin, and Mikels are entitled to qualified immunity for entering the property for one simple reason: they asked the right question of their superior, Lieutenant Coleman. As Hubbard testified:

> I do recall asking Lieutenant Coleman if we had papers on the house and he said that it was taken care of. He had talked to the

> Sheriff, they had talked to the Commonwealth Attorney, and we were good to go in. . . . According to Lieutenant Coleman, we were supposed to go in.

(Hubbard Dep. 9:3–7; 18–21.)  The radio transcripts show that Coleman told Martin that the Sheriff had spoken with the Commonwealth Attorney and "they have every right to go in." [ECF No. 121-13.]  And Coleman himself testified that he told Hubbard and Mikels at the fire station that, based on what the Sheriff told him, the deputies "had permission to go in." (Coleman Dep. 27:23–28:10.

Those facts make it clear that Hubbard, Martin, and Mikels reasonably believed that they had lawful permission to enter the property and the home.  It is reasonable for deputies to accept the word of their superiors that the appropriate legal steps have been taken.  Here, Deputy Hubbard even went so far as to ask Coleman directly whether they had "papers" on the house. Under these circumstances, a reasonable officer would have believed that entering the property was lawful.

Qualified immunity is meant to shield officials from liability for making "bad guesses in gray areas," Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992), and this situation so qualifies.  It was reasonable for the deputies to accept the word of their supervisor that the necessary "papers" had been issued, and they were not clearly wrong in relying on that information.  Had the writ of possession been entered, there is no doubt that the deputies would have been within their rights to enter the home and ensure the Paynes had access to the property. The false information they were given by their supervisor, without *any* evidence in the Record to suggest the deputies had reason to question Lt. Coleman, shields them from liability for their mistake.

The deputies are *not* entitled to qualified immunity for the taking of Plaintiffs' personal property, however, but they are entitled to summary judgment. Even though the deputies had *no reason whatsoever* to think the Paynes were entitled to all of Plaintiffs' personal property, and even though they grossly overstepped their authority in handing Plaintiffs' personal property over to the Paynes, Plaintiffs cannot recover under § 1983.

"Section 1983 was intended to protect only federal rights guaranteed by federal law, and not tort claims for which there are adequate remedies under state law." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (citing Tucker v. Duncan, 499 F.2d 963, 965 n.1 (4th Cir. 1974)). Section 1983 "is not a federal remedy for ordinary state tort claims, for it can vindicate only federal constitutional rights determined under federal substantive law." Tucker, 499 F.2d at 965 n.1. For the unlawful taking of their personal property, Plaintiffs possess "a post-deprivation remedy under Virginia law, the Virginia Tort Claims Act." Barbour v. Wheeler, No. 7:10-cv-00089, 2010 WL 1816625, at *1 (W.D. Va. Apr. 30, 2010); see also Foley v. Santiago, No. 97-6013, 1997 WL 294475, at *1 (4th Cir. June 3, 1997) (per curiam) (unpublished). A state law conversion claim is an adequate remedy at state law that is sufficient to sound the death knell to Plaintiffs' procedural due process claim for the taking of their personal property. Accord Vicory v. Walton, 721 F.2d 1062, 1063–66 (6th Cir.), cert. denied 105 S. Ct. 125 (1984)); Dockery v. Tucker, No. 2006 WL 5893295, at *10 (E.D.N.Y. Sept. 6, 2006). Therefore, Plaintiffs "cannot prevail with a constitutional claim under § 1983 . . . based on the alleged property loss in this case." Barbour, 2010 WL 1816625, at *1. The deputies are entitled to summary judgment on Count I.

## 2.    Count II: Violation of the Fourth Amendment

The deputies again assert qualified immunity as a shield to liability for the allegedly unlawful search of the property and seizures of both James and Kyle Epperson.

The Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.'  A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed.  A 'seizure' of property occurs where there is some meaningful interference with an individual's possessory interest in that property.'"  United States v. Jacobsen, 466 U.S. 109, 113 (1984).

The deputies argue that, because Plaintiffs' had no legally cognizable property interest in the property, there can be no Fourth Amendment violation.  This is wrong.  "[P]roperty rights are not the sole measure of Fourth Amendment violations."  Soldal v. Cook Cnty., Ill., 506 U.S. 56, 63 (1992).  "[T]he 'principal' object of the [Fourth] Amendment is the protection of privacy rather than property and 'this shift in emphasis from property to privacy has come about through a subtle interplay of substantive and procedural reform."  Id. (quoting Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 304 (1967).

This conclusion is more obvious when compared to the Fourth Amendment's protections in a criminal context.  When the Fourth Amendment is implicated, a warrant, exigent circumstances, or consent is required before police may enter a home.  Imagine that Plaintiffs were suspected of selling drugs from the property.  Would the deputies have sought a warrant to search the property even though the foreclosure sale occurred the day before?  Of course they would have, because they would have recognized that, despite the foreclosure, Plaintiffs still had a reasonable expectation of privacy at that address.  Because they did, the Fourth Amendment barred a warrantless intrusion into the property.

Nevertheless, for the reasons stated above, the deputies are entitled to qualified immunity for the entrance into and search of the home. They reasonably relied on the information relayed to them by their supervisor, and thus they are not liable for the wrongful entry into Plaintiffs' home.

Turning to the seizures of James and Kyle Epperson, the same qualified immunity analysis controls. "[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." United States v. Mendenhall, 446 U.S. 544, 553 (1980). "The Fourth Amendment's requirement that searches and seizures be founded upon an objective justification, governs all seizures of the person, 'including seizures that involve only a brief detention short of traditional arrest." United States v. Brignoni-Price, 422 U.S. 873, (1975) (citing Davis v. Mississippi, 394 U.S. 721 (1969); Terry v. Ohio, 392 U.S. 1, 16–19 (1968)). There is no doubt whatsoever that both James and Kyle Epperson were seized by the deputies.

Looking at the facts in the light most favorable to Plaintiffs, the deputies reasonably believed that eviction proceedings had concluded against Plaintiffs and that they remained on the property in derogation of the law. Based Coleman's statements to the deputies, they reasonably (but falsely) believed James and Kyle Epperson to be trespassers. When they encountered James Epperson, he was in possession of a firearm on property a reasonable officer would have believed he had no right to be on. Accordingly, and for their own safety, they seized him. Under these facts, I must conclude that a reasonable officer would not have known any such seizure to be improper, and accordingly the deputies are entitled to qualified immunity for seizing James Epperson.

The wrongful seizure of Kyle Epperson, regrettably, suffers the same fate. Based on what they had been told by Lt. Coleman, the deputies reasonably believed that Kyle was a trespasser, and the deputies are shielded from liability of that mistake under the doctrine of qualified immunity.

For these reasons, the deputies are entitled to summary judgment on Count II.

### 3. Count V: Trespass to Realty

For the reasons they are entitled to qualified immunity on Counts I and II, the deputies are entitled to the state law equivalent immunity for the common law claim of trespass. See DeChene v. Smallwood, 226 Va. 475 (1984). DeChene stands for the proposition that an officer is entitled to qualified immunity under Virginia law when he shows that (i) he believed in good faith that his actions were lawful, and (ii) that his belief was reasonable. Veney v. Ojeda, 321 F. Supp. 2d 733, 747 (E.D. Va. 2004) (citing DeChene, 226 Va. at 479). As discussed, it was reasonable for the deputies to rely on the information provided by their superiors. In the absence of any evidence to suggest that there was a reason to doubt Coleman's statements, the deputies are entitled to summary judgment on Count V.

### 4. Count VI: Conversion

Conversion "is any wrongful exercise or assumption of authority, personally or by procurement, over another's goods, depriving him of their possession." Universal C.I.T. Credit Corp. v. Kaplan, 92 S.E.2d 359, 365–66 (Va. 1956) (internal citation and quotation omitted). "Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion and it is not necessary that the wrongdoer apply the property to his own use. And when such conversion is proved, the

plaintiff is entitled to recover, irrespective of good or bad faith, care or negligence, knowledge or ignorance." Id. (internal citation and quotation omitted).

There is no doubt that a conversion of Plaintiffs' cars and other personal property occurred. The record is unclear, however, as to which of the deputies is responsible. James Epperson testified that "[a] guy took" his keys from his pocket and gave them to Vickie Payne. He is unsure who. (James Epperson Dep. 38:19–39:9.) James Epperson was clear, however, that it was *not* Deputy Martin. (Id. 39:6–7.) Whoever took the keys from James Epperson is liable for converting the personal property from Plaintiffs' to the Paynes.

Likewise, whichever deputy told Kyle Epperson that he "could not collect anything without asking the current people that owned the house if [he] could have it or not," (Kyle Epperson Dep. 12:6–9) is liable for conversion. Whoever made that statement wrongfully exerted dominion over the contents of the home and in denial of Plaintiffs' rights. Such actions, when coupled with his role as a law enforcement officer, amounted to a conversion.

Summary judgment is not appropriate, however, because the record is unclear as to which of the named defendant deputies, if any, undertook these wrongful acts. There is nothing in the record to suggest a concert of action such that all are liable as one. Likewise, the record offers no evidence to support a claim of immunity under DeChene. The testimony is clear that no one discussed what to do with any personal property in the home. Thus, the deputies cannot rely on the direction of their superiors to justify their actions. They had absolutely no basis to believe that the "papers," a presumed writ of possession, had anything to do with the personal property inside the home, let alone Plaintiffs' automobiles. A jury will need to determine who is responsible for the conversion of Plaintiffs' personal property. Summary judgment will be denied to Plaintiffs and the deputies on Count VI.

### 5. Count VII: Malicious Prosecution

To support a claim of malicious prosecution, a plaintiff must show: (1) the initiation or maintenance of proceedings by the defendant against the plaintiff; (2) termination of that proceeding favorable to the plaintiff; and (3) lack of probable cause to support that proceeding. Brooks v. City of Winston-Salem, 85 F.3d 178, 183 (4th Cir. 1996)).

Based on the uncontested facts in the record, the deputies are entitled to summary judgment on Count VII. As discussed above, they reasonably believed that Plaintiffs were trespassers. Accordingly, when they saw James Epperson with a shotgun, they had probable cause to arrest and charge him with brandishing a firearm under Virginia law.[7] Because there was probable cause to support that proceeding, even though all charges were dropped, Plaintiffs cannot prevail on this claim and the deputies are entitled to summary judgment.

### 6. Conclusion as to the deputies

For all the reasons stated above, the deputies are entitled to summary judgment on Counts I, II, V, and VII. Neither the deputies nor Plaintiffs are entitled to summary judgment on Count VI, and that claim will proceed to trial.

### c. **Smith and Coleman's Motion for Summary Judgment**

Both Plaintiffs and Defendants Smith and Coleman have moved for summary judgment on all counts. I will discuss each count, the relevant law, and the competing motions for summary judgment.

---

[7] Virginia Code § 18.2-282 makes it a crime to "point, hold or brandish" a firearm "in such a manner as to reasonably induce fear in the mind of another . . . ." See Kelsoe v. Commonwealth, 308 S.E.2d 104, 104 (Va. 1983) (per curiam). Although James Epperson may not have been able to see through the garage door, and although his maladies and medication may have slowed his reaction time in responding to the deputies' commands to put the weapon down, there still existed probable cause for his arrest based on what the deputies perceived. See Smith v. Monday, 848 F.3d 248, 253 (4th Cir. 2017) ("The probable-cause inquiry turns on two factors: 'the suspect's conduct *as known to the officer*, and the contours of the offense thought to be committed by that conduct.'" (quoting Graham v. Gagnon, 831 F.3d 176, 184 (4th Cir. 2016) (emphasis added)).

1. <u>Count I: Due Process/Takings Violation</u>

Neither Sheriff Smith nor Lieutenant Coleman is entitled to summary judgment as to the due process violation in regards to Plaintiffs' home.

"In order for the plaintiffs to succeed on their procedural due process claim, they are obliged to show (1) a cognizable 'liberty' or 'property' interest; (2) the deprivation of that interest by 'some form of state action'; and (3) that the procedures employed were constitutionally inadequate." <u>Iota Xi Chapter of Sigma Chi Fraternity v. Patterson</u>, 566 F.3d 138, 145 (4th Cir. 2009) (quoting <u>Stone v. Univ. of Md. Med. Sys. Corp.</u>, 855 F.2d 167, 172 (4th Cir. 1988)).

The evidence here is that, after speaking with the Commonwealth Attorney and being advised that the deputies could go with the Paynes while they did what they wanted to do with their property, either Smith or Coleman went outside her advice and told the deputies they had authority to enter the home. Accordingly, when either Smith or Coleman changed the advice given by the Commonwealth Attorney, and taking the facts in the light most favorable to Plaintiffs, they set in motion the unlawful taking of property in which Plaintiffs' had a cognizable property interest.

Smith and Coleman attempt to avoid this conclusion by arguing that Plaintiffs had no protected property interest, and thus were not entitled to any due process prior to the forcible removal from their home. But that argument misunderstands the evidence. When viewed in the light most favorable to Plaintiffs, James Epperson spoke with Vickie Payne and was given, at a minimum, an additional 24 hours in the home. According to James, he and Vickie agreed to speak the next day to arrange a time for her to come by, walk through the house, and get the keys. At that point, and assuming the law Smith and Coleman argue applies, Vickie Payne as

sole owner of the property gave Plaintiffs permission to stay until, at the earliest, the next afternoon. Before that period expired, either Smith or Coleman began filtering down instructions to extinguish Plaintiffs' remaining property rights without due process. Accord Minnesota v. Olson, 495 U.S. 91, 96–97 (1990) (holding that overnight guests have a legitimate expectation of privacy in their quarters).

A jury will need to decide who altered the advice of the Commonwealth Attorney, and why.[8] If the alteration was purposeful, Plaintiffs will be entitled to recover against the original transgressor. If, on the other hand, the alteration happened by reasonable mistake, Smith and Coleman will be entitled to prevail. The evidence is unclear at this stage, and thus the matter is not appropriate for summary judgment.

As to the takings claim in regard to Plaintiffs' personal property, the record is devoid of any action by Smith or Coleman that led to the taking. Because the issue was never discussed by or with Smith or Coleman, and because neither Smith nor Coleman played any role in the decision to take actions which dispossessed Plaintiffs of their personal property, Smith and Coleman are entitled to summary judgment insofar as Count I states a claims for an unlawful taking, without due process, of Plaintiffs' personal belongings.

## 2. Count II: Violation of the Fourth Amendment

Like their motion for summary judgment on Count I, Smith and Coleman's liability for a violation of the Fourth Amendment rises and falls on who altered the Commonwealth Attorney's advice, and why. In examining a Fourth Amendment claim, a court must first determine whether a party "had a reasonable expectation of privacy in the area searched or the item seized." United States v. Rusher, 966 F.2d 868, 873-74 (4th Cir. 1992). A warrantless search or seizure violates

---

[8] Deputy Foley testified that Sheriff Smith told him to "gain access to the house." (Foley Dep. 12:17–20.) Lt. Coleman testified that Smith told him that they "could go with [the Paynes] and make sure there was nobody else on the property." (Coleman Dep. 15:9–13.)

"the Fourth Amendment only if [the defendant] manifested a subjective expectation of privacy . . . that society accepts as objectively reasonable." <u>California v. Greenwood</u>, 486 U.S. 35, 39 (1988). "[A] search or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions." <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 474 (1971).

Here, regardless of whether the law recognized that Plaintiffs' retained some legal interest in the property following the foreclosure sale, they certainly had a reasonable expectation of privacy in their home that society would deem reasonable.[9] When either Smith or Coleman filtered down instructions to enter the home without legal justification, they set in motion a violation of the Fourth Amendment.

Smith and Coleman counter that the Paynes permission to enter the home absolves them from any liability. <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973). But taking the facts in the light most favorable to Plaintiffs, Vickie Payne permitted Plaintiffs to stay until at least midday on October 20. At that point Plaintiffs were, at a minimum, overnight guests protected by the Fourth Amendment. <u>See</u> <u>Olson</u>, 495 U.S. at 96–97. Under the facts, then, Smith and Coleman took the word of a stranger that they could enter a home they had no idea if she owned. By directing the officers to enter the home, either Smith or Coleman violated the Fourth Amendment. A jury will have to determine who made the fateful determination, and whether it was a purposeful act or a reasonable misunderstanding. Their Motion for Summary Judgment will be denied as to Count II.

### 3. Count III: Supervisory Liability

"The principle is firmly entrenched [in the law of § 1983] that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their

---

[9] <u>See</u> <u>infra</u> § III.b.2 (discussing a criminal law hypothetical on these facts).

subordinates." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). Liability, however, is not premised upon a theory of *respondeat superior*, but upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." Slakan v. Porter, 737 F.2d 368, 372–73 (4th Cir. 1984). In order to state a claim for supervisory liability under § 1983, Plaintiffs must show:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.), cert. denied, 513 U.S. 813 (1994).

To establish the first element—knowledge—a plaintiff must show "(1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." Shaw, 13 F.3d at 799. In turn, in order to establish a "pervasive" or "unreasonable" risk of harm, a plaintiff must present "evidence that the conduct is widespread, or at least has been used on several different occasions and the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." Id. To establish the second element—"deliberate indifference"—a plaintiff must show "a supervisor's 'continued inaction in the face of documented widespread abuses.'" Id. (quoting Slakan, 737 F.2d at 373). The Fourth Circuit has counseled that this is a "heavy burden:"

> Ordinarily, [a plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering

> every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct. A supervisor's continued inaction in the face of documented widespread abuses, however, provides an independent basis for finding he either was deliberately indifferent or acquiesced in the constitutionally offensive conduct of his subordinates.

Slakan, 737 F.2d at 373 (internal citations omitted). The third element—causation—is established "when the plaintiff demonstrates an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff." Shaw, 13 F.3d at 799 (quoting Slakan, 737 F.2d at 376). "[T]he causal link may be supplied by tort principle that holds a person liable for the natural consequences of his actions." Wellington v. Daniels, 717 F.2d 932, 936 (4th Cir.1983).

Despite a very questionable chain of events, Smith and Coleman are entitled to summary judgment on this count. Plaintiffs have failed to offer the necessary evidence of a "***pervasive*** risk" or "deliberate indifference," because they have failed to offer evidence that any such conduct has ever occurred before. If this is the first time such abuses have occurred, Plaintiffs recourse is their claims under Counts I and II. Due to a lack of evidence to support this claim, Plaintiffs' claim of supervisory liability under § 1983 must fail.

### 4. Count V: Trespass against Smith

Sheriff Smith is not entitled to summary judgment on the claim of trespass. Again, a jury must determine who altered the Commonwealth Attorney's advice and permitted the officers to enter the property without the necessary legal justification. If it was Smith, then he may be liable for the foreseeable trespass committed by the deputies. The jury will decide.

### 5. Count VI: Conversion against Smith

The claim of conversion cannot lie against Sheriff Smith. The record is clear that Smith did not opine on what to do with any personal property found on the premises, and no one sought his guidance or permission before dispossession Plaintiffs' of their belongings. Because Smith was not involved in the conversion or the decision-making process leading up to the conversion, he is entitled to summary judgment on Count VI.

### 6. Count VIII and IX: Violation of the Fourth and Fourteenth Amendments against Sheriff Smith in his official capacity

Turning to Counts VIII and IX, the claims against Smith in his official capacity, those claims are barred by the Eleventh Amendment.

Although the language of the Eleventh Amendment expressly refers to suits by citizens of another state, the United States Supreme Court "'has drawn on principles of sovereign immunity to construe the Amendment to establish that an unconsenting State is immune from suits brought in federal court by her own citizens as well as by citizens of another state.'" Lee-Thomas v. Prince George's Cnty. Pub. Sch., 666 F.3d 244, 248 (4th Cir. 2012) (quoting Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 304 (1990)). As such, the "ultimate guarantee of the Eleventh Amendment is that non-consenting states may not be sued by private individuals in federal court." Bd. of Trustees of Univ. Ala. v. Garrett, 531 U.S. 356, 363 (2001); see also Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 765 (2002) (quoting Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993)) ("[T]he doctrine's central purpose is to 'accord the States the respect owed them as joint sovereigns.'"). The Eleventh Amendment has also been interpreted to extend immunity to "'state agents and state instrumentalities.'" Lee-Thomas, 666 F.3d at 248 (quoting Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997)); see also Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219

(4th Cir. 2001). As Sheriff, Smith is considered an arm of the state entitled to the protections afforded by the Eleventh Amendment. See Blankenship v. Warren Co., 918 F. Supp. 970, 974 n.4 (W.D. Va. 1996) ("The Virginia Constitution creates five state officers which are charged with performing quintessential functions of state government: Commonwealth's Attorney, Treasurer, Commissioner of Revenue, Sheriff, and Clerk of the Court . . . [T]hese officers are . . . state actors and . . . are entitled to immunity pursuant to the Eleventh Amendment.").

The Eleventh Amendment's bar to suit, however, is not absolute. There are three recognized exceptions. First, Congress may abrogate state sovereign immunity. See Garrett, 531 U.S. at 363 (citing Kimel v. Florida Bd. of Regents, 528 U.S. 62, 79 (2000)). Second, a state can waive its Eleventh Amendment immunity. See Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 618 (2002). Third, a plaintiff can seek relief under the principles set forth in Ex Parte Young. See Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004) (citing Ex Parte Young, 209 U.S. 123 (1908)).

It is clear from the record, however, that none of the exceptions to the Eleventh Amendment's protections apply. Congress has not abrogated the states' immunity for suits under § 1983, see Quern v. Jordan, 440 U.S. 332, 338 (1979), Plaintiffs make no argument or showing that Virginia has waived its immunity, cf. Jacobs v. College of William & Mary, 495 F. Supp. 183, 190 (E.D. Va. 1980), and Plaintiffs are not seeking the relief contemplated in Ex Parte Young. Therefore, Smith is entitled to summary judgment on Counts VIII and IX.

IV.    **CONCLUSION**

The facts of this case confirm why law enforcement officers should not blindly accept what a stranger tells them. Vickie Payne's story to Sheriff Smith, while correct, omitted vital details. Sheriff Smith and Commonwealth Attorney Vipperman should have done more research

before taking action.  (See, e.g., Hubbard Dep. 49:10–16.)  Despite this, Vipperman's advice was technically correct, although obviously misguided.  Because her advice was legally sound and she had no other role is this fiasco, her Motion to Dismiss will be granted.

The deputies who went into the home on October 20—Deputies Hubbard, Martin, and Mikels—asked the right question of their superior; they were unfortunately given the wrong answer.  But their reliance on that answer was not objectively unreasonable.  Accordingly, they are entitled to summary judgment on those counts challenging their entry onto the property and into the home.  Likewise, when they encountered James and Kyle Epperson in the home, their actions were objectively reasonably *under these circumstances*.  They are entitled to summary judgment on those counts challenging the search of the property and the seizures of James and Kyle Epperson.

The deputies' decision to dole out Plaintiffs' personal property, however, was plainly wrong and violated both common law (conversion) and the Constitution (Fifth and Fourteenth Amendments).  Under the applicable law, Plaintiffs cannot recover for the constitutional violation because an adequate state remedy exists, so their conversion claim will proceed to trial.

Either Sheriff Smith or Lt. Coleman altered the advice given by the Commonwealth Attorney and instructed deputies under their command to enter a home in derogation of Plaintiffs' rights.  A jury must determine who made that fateful decision and why.  Summary judgment is not appropriate at this stage.  I am also unable to conclude, at this stage, that Smith and Coleman are entitled to judgment as a matter of law on Plaintiffs' Fourth Amendment claim.

Plaintiffs have failed to carry their burden to show Smith and Coleman are liable under a supervisory liability theory of § 1983, so summary judgment will be granted to Smith and

Coleman on Count III. Plaintiffs have also failed to connect Smith to the decision to take Plaintiffs' personal property, and so he is entitled to summary judgment on the conversion claim.

Finally, the Eleventh Amendment bars suits against Sheriff Smith in his official capacity. He is entitled to summary judgment on Counts VIII and IX.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 31st day of May, 2018.


s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE